**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY COLLINS, ANTOINE LACY, | ) | |
| JAMES NEAL, NATHANIEL THOMPSON, | ) | |
| JIMMY WASHINGTON, JAVIER MURCIO, | ) | |
| WAYNE EVANS, THOMAS BENNETT, and | ) | |
| WAYNE EVANS, JR., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.: 07-CV-1246 |
| | ) | |
| HERITAGE WINE CELLARS, LTD., and | ) | |
| STEVEN HIRSCH, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Currently pending before the Court are cross-motions for summary judgment by the collective Plaintiffs and Defendants. For the reasons set forth below, Plaintiffs' motion for summary judgment [31] is denied and Defendants' cross-motion for summary judgment [46] is granted in part and denied in part as moot.

**I.      Background**

Plaintiffs filed a one-count complaint [1] initiating this action against Defendants on March 5, 2007. In their complaint, Plaintiffs allege that Defendants are "employers" engaged in interstate "commerce" and/or the production of "goods" for "commerce" within the meaning of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 203. Compl. ¶ 14. Plaintiffs allege that Defendants, in contravention of the FLSA, "had a policy and practice of failing and refusing to pay Plaintiffs overtime compensation for hours worked in excess of forty (40) hours per week." Compl. ¶¶ 17, 18. Plaintiffs seek recovery for overtime compensation and attorneys fees under

the FLSA. Compl. ¶¶ 20, 21. Defendants' primary defense to Plaintiffs' allegations rests on the motor carrier exemption ("MCA exemption"), 29 U.S.C. § 213(b)(1).

## II.     Facts

### A.     Local summary judgment standards

The Court takes the relevant facts from the parties' respective Local Rule ("L.R.") 56.1 statements.[1]  The Court takes no position on whose version of disputed factual matters is correct. Local Rule ("L.R.") 56.1 requires that statements of facts contain allegations of material fact, and that the factual allegations be supported by admissible record evidence.  See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000).  The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1.  See*, e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).

Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement.  See*, e.g., Malec,* 191 F.R.D. at 583.  Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact.  See L.R. 56.1(a), (b)(3)(B); see also *Malec,* 191 F.R.D. at 584.  The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted."  *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).  In addition, the Court disregards any additional

---

[1]  See [31] Plaintiffs' Local Rule 56.1(a)(3) Statement of Facts ("Pls. SOF"); [50] Defendants' Response to Plaintiffs' Local Rule 56.1 Statement of Facts ("Defs. Resp."); [48], Defendants' Combined Local Rule 56.1(a)(3) Statement of Facts and 56.1(b)(3)(C) Statement of Additional Facts ("Defs. SOF"); and [58] Plaintiffs' Response to Defendants' Combined Local Rule 56.1(a)(3) Statement of Facts and 56.1(b)(3)(C) Statement of Additional Facts ("Pls. Resp.").

statements of fact contained in a party's response rather than in its statement of additional facts. See, *e.g., Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71 F.3d at 1317).

**B.      Pertinent facts for purposes of cross-motions for summary judgment[2]**

*1. Plaintiffs and Defendants*

All of the Plaintiffs are residents of Illinois.  Defs. SOF ¶ 1.  Defendant Hirsch also is a resident of Illinois.  *Id.* ¶ 3.  Defendant Heritage does business within the Northern District of Illinois and maintains its corporate headquarters in Niles, Illinois.  *Id.* ¶ 2.  Since at least March 1, 2004, Heritage has operated a warehouse in Niles, Illinois.  *Id.*

Hirsch is Heritage's President and Chief Executive Officer.  Pls. SOF ¶ 34, Ex. 2, Gonzalez Dep. at 89:19-20.  He is responsible for overseeing the day-to-day operations of Heritage, including, among other things, reviewing the finances of the company, exercising authority to set employees' rates of pay, reprimanding employees, and participating in the employee hiring and firing process.  Pls. SOF ¶ 35.  Hirsch also is responsible for Heritage's marketing, purchasing, sales, and operational activities.  Defs. SOF, Ex. L, Hirsch Aff. ¶ 1.

Heritage is, among other things, a wholesale wine importer and distributor in the Chicago area, servicing Illinois since 1981.  Pls. SOF ¶ 1, Exs. 1-2; Defs. Resp. ¶ 1.  During the relevant period, Heritage grossed more than $500,000.00 per year and engaged in interstate commerce activities.  Pls. SOF ¶ 2.

Plaintiff Wayne Evans, Sr. has worked as a driver and has made deliveries for Heritage from approximately November, 2001 through the present.  Pls. SOF ¶ 7, Ex. 10 Evans Dep. at 5:8-11; Defs. SOF ¶ 15.  Evans, Sr. also spent between one and two hours a day loading trucks. Defs. SOF ¶ 15; Pls. Resp. ¶ 15.  Since March 2004, Evans, Sr.'s regular route has been the far

---

[2] The Court notes that many of the statements of fact set forth in both parties' submissions are not relevant to the Court's disposition of the pending motions.

3

southwest suburbs of Chicago, including Downers Grove, Wheaton, Glen Ellyn, Naperville, Batavia, Schaumburg, and Des Plaines. Defs. SOF ¶ 17. Evans, Sr. made deliveries at least once a week in these locations to customers such as Binny's, Trader Joe's (through early 2005), Whole Foods, Costco and Sam's Club. *Id.*

Plaintiff Antoine Lacy worked for Heritage as a driver delivering products from July, 1997 until April 14, 2007. Pls. SOF ¶ 8, Ex. 12, Lacy Dep. at 4:13-14, 4:18-19; Defs. Resp. ¶ 8; Defs. SOF ¶ 9. Lacy's job responsibilities included the delivery of product, occasional oversight of other drivers, and passing out routes to other drivers. Defs. SOF ¶ 9. At times, Lacy also loaded trucks. *Id.* Lacy drove a twenty-four foot truck that weighed more than 10,000 pounds. Defs. SOF ¶ 9. Lacy had a permanent route from March, 2004 through April, 2007 in the Chicago Gold Coast area, which included deliveries to Trader Joe's, Whole Foods, Sam's Club, and Costco. *Id.* ¶ 11. Lacy made deliveries to Trader Joe's two to four times a week. *Id.*

Plaintiff Jimmy Washington worked as a driver and made deliveries for Heritage from September 26, 1994 until July, 2007. Pls. SOF ¶ 9, Ex. 16, Washington Dep. at 4:16-22; Defs. SOF ¶ 26. Washington drove a fourteen-foot truck that weighed approximately 26,000 pounds. Defs. SOF ¶ 26. Washington was assigned to a route in the Northeast suburbs, and made deliveries to Binny's in Skokie, Highland Park, and Glencoe, Wine Discount in Highland Park, and Trader Joe's (through early 2005) in Highland Park and Night Bridge. *Id.* ¶ 28.

Plaintiff Nathaniel Thompson has worked as a driver and has made deliveries for Heritage since approximately January, 2001 through the present. Pls. SOF ¶ 10, Ex. 9, Thompson Dep. at 5:22-6:1. Thompson spends approximately an hour each day loading his truck. *Id.* Thompson is regularly assigned the same fourteen-to-sixteen foot truck that weighs approximately 14,500 pounds. Defs. SOF ¶ 18. Between March, 2004 and March, 2007,

Thompson drove an assigned route in the Northwest suburbs, including customer locations in Buffalo Grove, Niles, Des Plaines, Schaumburg, Deerfield, Glenview, Northbrook, and Park Ridge. *Id.* ¶ 19. Thompson made deliveries at least once a week to those locations, including to large customers such as Binny's, Whole Foods, and Trader Joe's (until 2005). *Id.* Approximately three to four years ago, Plaintiff Thompson made one pick-up and two deliveries of wine to a location in New Berlin, Wisconsin. Pls. SOF ¶ 10. Plaintiff Thompson did not travel outside of Illinois for any other deliveries or pick-ups. *Id.*

Plaintiff Anthony Collins worked as a driver delivering product for Heritage from April, 2003 until March, 2007. Pls. SOF ¶ 11, Ex. 13, Collins Dep. at 7-8; Defs. SOF ¶ 6. Collins also spent at least thirty minutes each day loading trucks. Defs. SOF ¶ 6. Collins drove a van and a fifteen-foot truck that weighed more than 10,000 pounds. Defs. SOF ¶ 6. Collins generally had the same downtown route every day and delivered product to the same customers weekly. *Id.* ¶ 8. Those customers included Whole Foods and Trader Joe's. *Id.* Collins also made deliveries to Costco once or twice a week. *Id.*

Plaintiff Javier Murcio has worked as a driver and has made deliveries for Heritage from June, 2001 to the present. Pls. SOF ¶ 12, Ex. 14, Murcio Dep. at 5:22-6:1; Defs. SOF ¶ 20. Murcio drives an eighteen-foot truck that weighs over 10,000 pounds. Defs. SOF ¶ 20. Murcio spends approximately an hour and a half each day loading his truck. Defs. SOF ¶ 20. Since March, 2004, Murcio has driven a Northwest route which includes deliveries at least once a week to large customers, including three different Costco stores, Whole Foods, four different Trader Joe's stores (through early 2005), and three different Binny's locations. *Id.* ¶ 22.

Plaintiff Thomas Bennett has worked as a driver and has made deliveries for Heritage since approximately August, 1998 through the present. Pls. SOF ¶ 13, Ex. 11, Bennett Dep. at

5:23-6:3; Defs. SOF ¶ 12. Bennett spends approximately one and one half to two hours a day loading trucks. Defs. SOF ¶ 12. Since March, 2004, Bennett has driven a twenty-four-foot truck that weighs approximately 33,000 pounds. Defs. SOF ¶ 12. Bennett had an assigned route for the last few years which included Lombard, Downers Grove, Oak Brook, and Oak Park, and made deliveries on that route to customers such as Binny's, Trader Joe's (at least through 2005), Costco, and Whole Foods. *Id.* ¶ 14. Pls. Resp. ¶ 14. In 2006, Bennett made occasional pick-ups from New Berlin, Wisconsin, and Indianapolis, Indiana in a van that weighed less than 10,001 pounds. Pls. SOF ¶ 13, Ex.11, Bennett Dep. at 45:22-49:7; Defs. Resp. ¶ 13.

Plaintiff James Neal worked as a truck driver and delivered product for Heritage from February, 2002 until February 21, 2005. Pls. SOF ¶ 14, Ex. 8, Neal Dep. at 5:10-14; Defs. Resp. ¶ 14; Defs. SOF ¶ 23. Neal drove an eighteen-foot truck that weighed less than 26,000 pounds. Defs. SOF ¶ 23. Neal also was responsible for loading his truck each morning. *Id.* Between March, 2004 and February 21, 2005, Neal was assigned to the downtown Chicago Loop route, and made deliveries to a Sam's Club, Trader Joe's, and Binny's in that area. Defs. SOF ¶ 25.

Heritage pays (or paid) all Plaintiffs on an hourly basis. *Id.* ¶¶ 7-14; Defs. Resp. ¶¶ 7-14. None of the Plaintiffs has knowledge of Heritage's volume of shipments, sales projections, volume of customer purchases, customer demand, sales plans, supplier goods, projections of customer demand, historical sales figures, actual present orders, or relevant market surveys. Defs. SOF ¶¶ 7, 11, 13, 16, 21, 24, 27. Based upon a review of route sheets covering their deliveries, however, each Plaintiff is aware of the quantities and types of wines that he delivered for particular customers on a day-to-day basis. Pls. Resp. ¶¶ 7, 11, 13, 16, 21, 24, 27, Evans, Sr. Decl. ¶¶ 6-7, Lacy Decl. ¶¶ 6-7, Washington Decl. ¶¶ 6-7, Thompson Decl. ¶¶ 6-7, Collins Decl. ¶¶ 6-7Murcio Decl. ¶¶ 6-7, Bennett Decl. ¶¶ 6-7, Neal Decl. ¶¶ 6-7.

As explained above, on limited occasions, Plaintiffs Thompson and Bennett made interstate deliveries and/or pick-ups outside of Illinois, and drove vans on those trips. Pls. SOF ¶ 6; Defs. Resp. ¶ 6. Heritage acknowledges that Plaintiffs Evans, Sr., Lacy, Washington, Collins, Murcio, and Neal never made or were asked to make pick-ups or deliveries outside of Illinois. Pls. SOF ¶¶ 7-9, 11-12, 14; Defs. Resp. ¶¶ 7-9, 11-12, 14. Consistent with that acknowledgement, Heritage's Chief Financial Officer ("CFO") J.R. Gonzalez has no recollection of any Plaintiff other than Thompson and Bennett driving outside of Illinois, nor does he believe that an expectation was established that Plaintiffs would be required to make such out-of-state trips. Pls. SOF Ex. 2, Gonzalez Dep. at 44:12-19.

The parties' relationship during the relevant period was governed by a collective bargain agreement. On August 20, 2004, Heritage entered into a "Labor Contract and Working Agreement" (the "Agreement") with its employees which governed, among other things, the payment of overtime wages. Pls. SOF ¶ 15. Pursuant to the express terms of the Agreement, Heritage agreed that "[t]ime and one-half rate shall be paid after eight (8) hours in one day and after forty any hours in any one week." *Id.* ¶ 16; Defs. SOF ¶ 79. Heritage's CFO J.R. Gonzalez indicated that even though the Agreement stated that Heritage's union employees would be paid overtime, Heritage never intended to honor the contract. Pls. SOF ¶ 17, Ex. 2, Gonzalez Dep. at 21:8-11, 22:2-6. Consistent with that position and notwithstanding the Agreement, prior to January, 2007 Heritage did not pay overtime to Plaintiffs for hours worked over forty (40) hours per week. Pls. SOF ¶ 17. At least one Plaintiff, Thompson, for example, has no recollection of Heritage posting any information about minimum wage rights or overtime rights. *Id.* ¶ 19, Ex. 9, Thompson Dep. at 45:19-46:2.

Additionally, although Heritage was required to maintain a time clock to track employees' hours worked pursuant to the terms of the Agreement, Heritage failed to do so. Pls. SOF ¶ 18. Heritage maintained no accurate records identifying the actual hours worked by Plaintiffs during the relevant period. *Id.*

### 2. *Heritage's Operations*

Heritage imports wines from all over the world, including from Italy, Germany, Spain, and France. Pls. SOF ¶ 20; Defs. Resp. ¶ 20. Since at least March 1, 2004,[3] 100% of Heritage's revenues have resulted from out-of-state shipments of wine merchandise into Heritage's warehouse located in Niles, Illinois. Defs. SOF ¶ 29. Heritage's customers have included restaurants, hotels, chain stores, and independent retail merchants such as Trader Joe's (through early 2005), Binny's, Cost Plus World Market, Whole Foods, Schafer's, Costco, Wine Discount Centers, and Sam's Wine and Spirits. *Id.* ¶ 30; Pls. Resp. ¶ 30. These customers accounted for 69.4% of the cases of wine delivered in 2004, 35.0% of the cases of wine delivered in 2005, and 36.6% of the cases of wine delivered in 2006. Defs. SOF ¶ 31. For example, in 2004, these eight customers accounted for 49.1% of the dollar sales of wine to Heritage's customers. *Id.* In 2004, Heritage made approximately $45,700,000 in total sales, $23,000,000 (or approximately 51%) of which were derived from sales to Heritage's largest customers and represented 70% of the total cases shipped by Heritage. *Id.* ¶ 32. In 2005, Heritage did approximately $32,500,000 in total sales, $11,500,000 (or approximately 35%) of which were derived from sales to Heritage's largest customers, representing 38% of all cases shipped by Heritage. *Id.* ¶ 33. In 2006, Heritage did approximately $38,000,000 in total sales, $13,500,000 (or approximately

---

[3] The unconverted facts regarding Heritage's operations all date to a starting point of March 1, 2004. Unless otherwise noted, the Court's references to Heritage's operations fall within the timeframe of March 1, 2004 forward.

35%) of which were derived from sales to Heritage's largest customers, representing 38% of all cases shipped by Heritage. *Id.* ¶ 34.

Heritage buys wines from vineyards or wineries, all of which are located outside Illinois. *Id.* ¶ 35. All product that comes into Heritage's warehouse is purchased by Heritage. *Id.* ¶ 29. Bills of lading for wine purchased by Heritage designate Heritage as the purchaser and list Heritage as the customer to whom the wine is delivered. Pls. SOF, Ex. 3, Hirsh Dep. at 16:19-22. Heritage's Warehouse Manager, David O'Connell, confirmed that at the time that wine comes into Heritage's Chicago warehouse, Heritage generally is identified as the customer or the purchaser of the wine. Pls. SOF ¶ 20, Ex.6, O'Connell Dep. at 11:21-12:1. David O'Connell testified that 99% of the orders for Heritage's customers are picked and pulled in the warehouse in Chicago rather than being sent directly to a customer. Pls. SOF ¶ 20; O'Connell Dep. at 11:16-20. The paperwork associated with most, if not all, of Heritage's transactions with the out-of-state wineries or vineyards, identifies only Heritage (and no other entity) as the shipper. Pls. Resp. ¶ 42; Gonzalez Dep. at 52:24-53:14, O'Connell Dep. at 11:21-12:1.

Heritage has arranged for the transportation of the wine from those vineyards or wineries to its warehouse in Illinois by paying for all of the transportation charges, both out-of-state (by engaging drivers to bring the wine to Illinois) and locally (by employing Plaintiffs to make deliveries within Illinois). Defs. SOF ¶ 35; Pls. SOF ¶ 35. Specifically, Heritage covers transportation costs by (i) paying for the taxes, (ii) paying for the freight, (iii) paying for the insurance, (iv) paying for all custom fees, (v) transporting the wine freight on board (F.O.B.), (vi) hiring and paying the freight forwarder that arranged for the transportation, (vii) determining the type of shipping container, including whether temperature is controlled or refrigerated or insulated, and (viii) acting as its own custom broker. Defs. SOF ¶ 36. In 2004, Heritage spent a

total of $2,247,207.83 on these latter shipping costs; in 2005, $1,790,162.02; and in 2006, $2,162,274.62.  *Id.* ¶ 37.

Once the wine left the winery or vineyard, Heritage was responsible for it.  *Id.*  Upon tender to the over-the-road trucker for domestic shipments coming from the East or West Coast, Heritage took title to and control of the wine, which then was transported to Heritage's warehouse in Niles, Illinois.  Defs. SOF ¶ 38.  With overseas shipments, Heritage took possession of the shipping container at the point of origin.  *Id.* ¶ 39.  With domestic shipments transported by over-the-road trucks, Heritage took possession of the wine at the winery or vineyard, or the location where the winery or vineyard stored its wines for transportation purposes.  *Id.*  For overseas shipments, Heritage has used a freight forwarder that has acted as Heritage's agent in arranging the transportation for which Heritage has paid.  *Id.* ¶ 40.  In short, the product that Heritage arranges to transport is Heritage's responsibility from the time that it leaves its point of origin or the location where the wine was stored (for example, a winery).  *Id.*

Hirsch attests that pre-orders or pre-arrival orders, which involved standing orders, pre-arrival offering, clearing of merchandise, and wine sold as futures, have accounted for approximately 25% of the cases of wine Heritage ships.  Defs. Resp. ¶ 20; Defs. SOF ¶ 41, Hirsch Aff. ¶ 6.[4]  In those instances, Heritage arranged the transportation of that wine from out-

---

[4] Plaintiffs respond to a number of Defendants' statements of fact by stating that "Defendants have not submitted a single document to this Court or Plaintiffs that would either confirm or deny [the] statement or that would establish that the shippers * * * had any knowledge that anyone other than Heritage was the intended ultimate purchaser of the wine at the time it was shipped." Pls. Resp. ¶ 41; see also Pls. Resp. ¶¶ 42-49.  Plaintiffs do not, however, offer any evidence that contradicts the specific evidence by which Hirsch has attested in these statements. Rule 56 makes clear that a moving party may support its summary judgment motion by affidavit.  Fed. R. Civ. P. 56(c), 56(e)(1).  The adverse party "by affidavits or [other evidence], must set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  Because Plaintiffs fail to provide contrary evidentiary proof sufficient to call into question the facts attested to by Hirsch that are within his personal knowledge, those facts are deemed admitted pursuant to L.R. 56.1(b)(3)(B).  See *Raymond v. Ameritech Corp.*, 2005 WL 525421, at *3 (N.D. Ill. March 4, 2005) (citing L.R. 56.1(b)(3)(B)) ("The opposing party's failure to controvert the moving party's statement of fact results in the moving party's version of the fact being admitted").

of-state and overseas wineries to Heritage's warehouse in Niles, Illinois, and then Heritage's drivers delivered that wine from Heritage's warehouse to the customers from whom it received pre-orders within a few days of the wine's arrival to its warehouse. *Id.* For example Binny's, whose purchases accounted for approximately 10% of Heritage's total business, used standing orders to order wine. Defs. Resp. ¶ 20, Ex. M, Hirsch Aff. ¶ 6; Defs. SOF ¶ 42, Hirsch Aff. ¶ 8. Binny's would detail what wine it wanted to purchase and ship, a certain quantity, and the date on which it should be delivered. Defs. SOF ¶ 42, Hirsch Aff. ¶ 8. Approximately 20% of the business that Binny's did with Heritage came from standing orders. *Id.* Other customers with similar arrangements with Heritage included Sam's, the Wine Discount Center Stores, and Costco. *Id.* These types of orders accounted for approximately 5% of Heritage's gross sales, and 5% of the deliveries made by Heritage locally (by Plaintiffs). *Id.*

Of the more than $13 million in sales that Heritage did with Trader Joe's in 2004, approximately $12 million, or 92.3% sales volume, involved sales where Trader Joe's selected and ordered wine in advance of Heritage placing the order with the winery or vineyard. Defs. SOF ¶ 43, Hirsch Aff. ¶ 16. Hirsch attests that approximately 90% of the deliveries that Heritage's drivers made to Trader's Joes locations in 2004 involved wine that Trader Joe's had ordered in advance. *Id.*

In the years 2004-2007, Heritage also arranged certain "private label wine" orders where the Heritage's customer requested that particular wine be "expressly designated" for that customer. Defs. SOF ¶ 44, Hirsch Aff. ¶ 9. For example, the wine brands Painted Horse and Riven Rock from California and Vida Organica from Argentina, respectively, were transported by Heritage exclusively for, and sold to, Whole Foods. *Id.* Heritage agreed to purchase, transport and deliver the wine to Whole Foods from the wineries or vineyards in California and

Argentina. *Id.* Approximately 5% of Heritage's total wines sales and approximately 5% of its deliveries made by its drivers involved private label wines or similar arrangements with Heritage's customers. *Id.*

Heritage also used pre-buy sheets for certain limited-offering wines, allowing for pre-arrival ordering. Defs. SOF ¶ 45, Hirsch Dep. at 36-17-23, 37-18; Hirsch Aff. ¶ 11. For pre-arrival offerings, Heritage required customers to take immediate delivery of the wine upon arrival at Heritage's warehouse. Defs. SOF ¶ 45, Hirsch Aff. ¶ 11. For example, in the years 2004-2007, Heritage ordered a selection of expensive wines from the Burgundy region in France. *Id.* Heritage took orders from customers by a required date, placed an order with the winery, and transported the wine to Heritage's warehouse. *Id.* Heritage's drivers then delivered the wine to the customers. *Id.* Heritage delivered approximately 1,000 cases of wine from the Burgundy region through this pre-arrival offer each year. Heritage's pre-arrival offering business represented approximately 15% of the deliveries transported by Plaintiffs as Heritage's drivers. *Id.*

Hirsch made customer demand projections when determining how much wine to order and transport from out-of-state or overseas wineries and vineyards and then sell to Heritage's Illinois customers based on a review of the following: (i) historic need and usage of Heritage's customers; (ii) anticipated sales conditions; (iii) specific or standing orders by Heritage's customers; (iv) historical sales figures to and past order history of Heritage's customers; (v) projections of likely need by Heritage's customers. Defs. SOF ¶ 47, Hirsch Aff. ¶ 13. As an example, to gauge the volume of Painted Horse wine to be transported through Heritage's warehouse and delivered to Whole Foods, Hirsch reviewed several factors, including Whole

Food's buying habits, Whole Food's historical need for Painted Horse wine, anticipated sales conditions, and market trends. Defs. SOF ¶ 49, Hirsch Aff. ¶ 15.

A majority of the wine delivered to Heritage has been placed in the warehouse for a limited period of time. Defs. SOF ¶ 50. Heritage brought over-the-road trucks in every two weeks to ensure a constant rotation of the wine merchandise in the warehouse. *Id.* Thus, the wine that Heritage purchased rotated through the warehouse on a regular, constant basis throughout the year. *Id.* For example, most of the domestic wines purchased by Heritage completely turn over approximately every month. *Id.*

Heritage has kept detailed records of each log of the trip and/or transportation of the wine from origin to destination at Heritage's warehouse. Defs. SOF ¶ 53. A computer system was used to track and document the wine cases coming in and going out, including, for example, the name of the winery where the wine was produced, and the destination of the wine. *Id.* Heritage tracked the transportation of the wine from the time that the winery gave Heritage a release date for the wine to be transported by the over-the-road drivers to when it was received in Heritage. *Id*. Once at the warehouse, the wine is still subject to control and direction as to its subsequent transportation or delivery by Heritage's drivers (such as the Plaintiffs) to Heritage's customers. *Id.* ¶ 54.

When Heritage purchases and receives wine from outside of Illinois, the wine is delivered by truck on shrink-wrapped pallets to its Niles warehouse in Illinois. Pls. SOF ¶ 21; Defs. SOF ¶ 55. The pallets are then unwrapped and broken down, and the wine is placed inventory in the warehouse. Defs. SOF ¶ 57; Pls. Resp. ¶ 57. In most instances, upon receipt of a local order from an Illinois customer, the wine is then picked from inventory by Heritage warehouse

workers, placed on a pallet different from the one on which the wine initially arrived, and sorted for local delivery by Plaintiffs.  Pls. SOF ¶ 23; Defs. Resp. ¶ 23.

Heritage is not licensed with the Department of Transportation or the Federal Motor Carrier Safety Administration as a motor carrier.   Pls. SOF ¶ 5; Defs. Resp. ¶ 5.  Trucks owned by Heritage are only licensed to be driven in Illinois.  *Id.*  Prior to January of 2007, Defendants never consulted with the Department of Labor to determine whether their pay practices were in compliance with the FLSA.  Pls. SOF ¶ 37.  Nor had Defendants, prior to January, 2007, consulted with an accountant or an attorney to determine whether their pay practices were in compliance with the FLSA.  *Id.* ¶¶ 38-39.  Up until January, 2007, Heritage had not used a time clock or paid employees for hours worked over forty hours in a work week.  *Id.* ¶ 40.

## III.   Analysis

### A.   Standard of Review

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).   A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The party seeking summary judgment has the burden of

establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

## B. The FLSA and the MCA Exemption

On the facts before the Court, it is undisputed that Defendants did not pay Plaintiffs for time worked in excess of forty hours a week. See Pls. SOF ¶¶ 17, 40. The FLSA requires employers to pay employees one and one-half times their normal hourly wage for each hour they work in excess of forty hours per week. 29 U.S.C. § 207(a)(1). The question raised by both parties in their respective cross-motions for summary judgment is whether Heritage's drivers are covered by the overtime mandate of the FLSA (as Plaintiffs contend) or whether Heritage can avail itself of an exemption to that mandate (as Defendants contend). Under the specific exemption that Heritage attempts to invoke, the FLSA's overtime provisions do not apply to employees over whom "the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [49 U.S.C. § 13502]" of the Motor Carrier Act. 29 U.S.C. § 213(b)(1). The Secretary of Transportation need not actually have exercised its power for the exemption to apply[5] — "it is the existence of that power [to establish

---

[5] The Court finds unpersuasive Plaintiffs' contention that Defendants' failure to register with the Department of Transportation is subjective evidence that the Defendants themselves did not believe the

qualifications and maximum hours of service] (rather than the precise terms of the requirements actually established by the Commission in the exercise of that power) that Congress has made the test as to whether or not § 7 of the Fair Labor Standards Act is applicable to these employees." *Morris v. McComb*, 332 U.S. 422, 434 (1947); see also *Jones v. Centurion Invest. Assocs.*, 268 F. Supp. 2d 1004, 1008 (N.D. Ill. 2003). Although motor carriers may engage in both intrastate and interstate commerce, "a motor carrier cannot be subject to the jurisdiction of both the Secretary of Labor and the Secretary of Transportation." *Ruiz v. Affinity Logistics Corp.*, 2006 WL 3712942, at *4 (S.D. Cal. Nov. 9, 2006).

Pursuant to 49 U.S.C. § 31502, the MCA exemption applies to transportation as set forth in 49 U.S.C. §§ 13501 and 13502, which provide that the Secretary of Transportation may prescribe requirements for qualifications and maximum hours of service for "motor carriers" and "private motor carriers" "when needed to promote the safety of operations." See 49 U.S.C. § 13502(b). Under the applicable Department of Labor regulation, the MCA exemption applies:

> to those employees * * * whose work involves engagement in activities consisting wholly or in part of a class of work which is defined (i) as that of a driver * * * , and (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce with the meaning of the Motor Carrier Act.

29 C.F.R. § 782.2(b)(2). "Exemptions [to the FLSA] are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) (citing *Mitchell v. Lubin, McGaughy, & Assoc.*, 358 U.S. 201, 211 (1959)); *Klein v.*

---

exemption at issue was applicable. The question is not whether Heritage intended to be governed by the Department of Transportation or is in fact in compliance with Department of Transportation regulations, but rather whether Heritage's activities fall within the motor carrier practices over which the Department of Transportation has power and authority. See *Jones v. Centurion Invest. Assoc., Inc.*, 268 F. Supp. 2d 1004, 1008-1009 (N.D. Ill. 2003) ("[T]he DOT retains its jurisdiction over employees within the scope of its authority regardless of whether or not it has chosen to exercise its regulatory authority, and the overtime exemption applies to such employees despite the lack of DOT regulation").

*Rush-Presbyterian St. Luke's Med. Ctr.*, 990 F.2d 279, 282 (7th Cir. 1993); see also *Nichols v. City of Chicago*, 1992 WL 92117, at *8 (N.D. Ill. Apr. 30, 1992) ("An exemption to the FLSA may only be applied in circumstances which plainly and unmistakably come within the terms and spirit of the exemption."). The employer bears the burden of demonstrating an employee's exempt status. *Piscione v. Ernst and Young, LLP*, 171 F.3d 527, 533 (7th Cir. 1999); *Shaw v. Prentice Computer Publ'g, Inc.*, 151 F.3d 640, 642 (7th Cir. 1997).

Here, Defendants bear the burden of showing that the MCA exemption applies to each Plaintiff. Because "[t]he exemption * * * depends upon the activities of the individual employees," Defendants must come forward with evidence as to "the character of the activities involved in the performance" of each Plaintiff's job to enable the Court to determine whether Heritage owes each of the Plaintiffs overtime compensation. *McGee v. Corporate Express Delivery Systems*, 2003 WL 22757757, at *3 (N.D. Ill. Nov. 20, 2003) (citing *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 235 (7th Cir. 1961)). The activities of one Plaintiff cannot justify a blanket exemption for other Plaintiffs. *Id.*

### 1. *The Practical Continuity of Interstate Commerce*

The parties do not dispute that Plaintiffs are or were employed as drivers for Heritage. As such, Plaintiffs' actions affected the safety of operation of motor vehicles on the public highways. 29 C.F.R. § 782.2(b)(2); 29 C.F.R. § 782.3(a); see also *McGee*, 2006 WL 22757757 at *4. The parties' dispute over the applicability of the motor carrier exemption centers on whether Plaintiffs were engaged in interstate commerce when making local deliveries for Heritage. There also is no dispute that only two of the Plaintiffs – Thompson and Bennett – ever made any interstate deliveries and the routes routinely driven by all of the Plaintiffs were entirely within Illinois (and in the Chicago area).

Although the transportation provided by Plaintiffs in most instances did not cross state lines, the interstate commerce requirement still may be satisfied if the wine is transported within the borders of Illinois as part of a "practical continuity of movement" in the flow of interstate commerce. *Walling v. Jacksonsville Paper Co.*, 317 U.S. 564, 568 (1943). When considering whether the goods are part of a practical continuity in the flow of interstate commerce, a crucial factor is the "original and persisting intention of the shippers." *Baltimore & O.S.W.R.R. v. Settle,* 260 U.S. 166, 174 (1922); *Alice v. GCS, Inc.*, 2006 WL 2644958, at *1 (N.D. Ill. Sept. 14, 2006) ("Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment").

The parties appear to disagree on the appropriate test for determining "practical continuity" in the flow of interstate commerce. Defendants assert that the analysis set forth in a policy statement issued by the Interstate Commerce Commission in 1992 applies (see *Motor Carrier Interstate Transportation — From Out-of-State Through Warehouses to Points in Same State*, 8 I.C.C.2d 470, 1992 WL 122949, (May 8, 1992) (hereinafter referred to as the "1992 policy statement"); Plaintiffs focus their analysis on an older ICC test, codified at 29 C.F.R. § 782.7(b), which was first developed in 1957. As explained below, the disagreement is important, for it bears on the Court's analysis for purposes of the parties' cross-motions for summary judgment on the MCA exemption issue.

In 1957, the ICC formulated a three-part test to assist in the determination of a shipper's intent at the time of shipment "where the transportation was confined to point in a single State from a storage terminal of commodities which have had prior movement by rail, pipeline, motor, or water from an origin in a different state." Ex Parte No. MC-48, codified at 29 C.F.R. § 782.7. The 1957 test made clear that:

there is *not* fixed and persisting intent where: (i) at the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage.

29 C.F.R. § 782.7(b)(2) (noting that the Sixth Circuit specifically adopted this test in *Baird v. Wagoner*, 425 F.2d 407 (6th Cir. 1970)) (emphasis added). Most of Plaintiffs' arguments concerning the MCA exception presume that the 1957 ICC test applies. See, *e.g.*, Pls. SJ Mem. at 6-7 (citing 29 C.F.R. § 782.7); Pls. Opp. at 11.

Since 1957, a number of courts have determined that other factors are relevant to determining the presence of a fixed and persisting intent to ship products in interstate commerce, including: (1) whether and for how long the length of time for the movement of product is interrupted by storage; (2) whether the product distribution has a low through-put compared to its storage capacity; (3) whether the carrier is in continuous possession of the product through to delivery; (4) whether the products are shipped on a "predetermined" ordering cycle; (5) whether the product is processed or commingled at the storage location; (6) whether the goods were intended for certain customers; and (7) whether the storage simply was a convenient and temporary way to convert the means of delivery from one form of transportation to another. *Musarra v. Digital Dish, Inc.*, 454 F. Supp. 2d 692, 708 (S.D. Ohio 2006) (citing *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672-673 (10th Cir. 1993) (citing *Midwest Moto Freight Bureau v. I.C.C.*, 867 F.2d 458 (8th Cir. 1989)); *Texas v. United States*, 866 F.3d 1546, 1556-1557 (5th Cir. 1989); *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 947 (5th Cir. 1969)). In 1990, foreshadowing the new position adopted by the ICC in 1992, the Fifth and Ninth Circuits observed that the three-part test for determining whether the shipper had a "fixed and persisting"

intent had been phased out, and the Eighth Circuit went a step further, deeming the old test "outmoded" and specifically declining to adopt it. *Musarra*, 454 F. Supp. 2d at 708 (citing *Roberts v. Levine*, 921 F.2d 804, 812 (8th Cir. 1990)) (finding the *Baird* test codified at 29 U.S.C. § 782.7(b)(2) outmoded and declining to adopt it); *California Trucking Ass'n v. I.C.C.*, 900 F.2d 208, 213 (9th Cir. 1990) ("Even though the ICC has never explicitly stated that it was abandoning the more structured [1957] test, it appears that its use of that standard has been refined, if not phased out"); *Central Freight v. I.C.C.*, 899 F.2d 413, 421 (5th Cir. 1990) (stating that the ICC "appears to have implicitly recharacterized the applicable test"). The Fifth, Eighth, and Ninth Circuits all cited with approval a 1986 decision by the ICC, *Armstrong World, Inc. v. I.C.C.*, 2 I.C.C.2d 63, 69 (1986), in support of their decisions to move away from the prior test. *Musarra*, 454 F. Supp. 2d at 708. In *Armstrong*, the ICC broadened the relevant inquiry, explaining that "[t]he determination of whether transportation between two points in [a] State in interstate (or foreign) or intrastate in nature depends on the 'essential character' of the shipment. * * * Crucial to this determination is the shipper's fixed and persisting intent at the time of shipment * * * [which] is ascertained from *all the facts and circumstances surrounding the transportation*." *Armstong*, 2 I.C.C.2d at 69.

In its 1992 policy statement, the ICC promulgated an alternative test that has been applied in subsequent administrative proceedings involving disputes over whether transportation within a state constitutes intrastate or interstate commerce. See 1992 policy statement, Ex Parte MC No. 207, 8 I.C.C.2d 470, 1992 WL 122949 (May 8, 1992); see also *Advantage Tank Lines, Inc.*, No. MC-C-30198, 10 I.C.C.2d 64 (1994). In that policy statement, which Defendants contend controls here, the ICC offered more detail on the relevant inquiry for the determination of a shipper's intent when considering whether certain movement within a state constituted

intraste or interstate commerce. The ICC stated that "[t]he essential and controlling element in determining whether the traffic is properly characterized as interstate is whether the shipper has a 'fixed and persisting intent' to have the shipment continue in interstate commerce to its ultimate destination." 1992 Policy Statement, 1992 WL 122949, at *1. It went on to find that "[w]here the shipper has a 'fixed and persisting intent' that the merchandise continue in interstate or foreign commerce from or to an out-of-State origin or destination, via a warehouse or distribution center, is ascertained from *all the facts and circumstances surrounding the transportation*." *Id.* at *2 (emphasis added).

The ICC noted that the following factors have been considered in establishing that the in-State component *is* part of a continuing movement in commerce, and hence subject to its regulation:

(1)    Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. The factual basis for projecting customer demand may include, but is not limited to, historical sales in the State, actual present orders and relevant market surveys of need.

(2)    No processing or substantial product modification of substance occurs at the warehouse or distribution center. However, repackaging or reconfiguring (secondary packaging) may be performed.

(3)    While in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation.

(4)    Modern systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center.

(5)    The shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier.

(6)    The warehouse utilized is owned by the shipper.

(7)    The shipments move through the warehouse pursuant to a storage-in-transit tariff provision.

*Id.* at *2.  The ICC further noted that certain factors alone are insufficient to establish that the continuity of interstate commerce is broken at the warehouse or distribution center.  *Id.*  In particular, the ICC observed "that the absence of time limitations on storage and the absence of storage-in-transit receipts by the warehouse or distribution center are not sufficient to establish that the continuity of interstate commerce is broken."  Conversely, ICC has determined that the following factors are insufficient to establish a break in continuity:

(1)    The shipper's lack of knowledge of the specific, ultimate destination [] at the time the shipment leaves its out-of-state destination;

(2)    Separate bills of lading for the inbound and outbound movements instead of through bills of lading;

(3)    Storage-in-transit tariff provisions;

(4)    Storage receipts issued by the warehouse or distribution center;

(5)    Time limitations on storage;

(6)    Payment of transportation charges by the warehouse or distribution center, when the shipper [] is ultimately billed for such charges;

(7)    Routing of the outbound shipment by the warehouse or distribution center;

(8)    A change in carrier or transportation modes at a distribution facility;

(9)    Use of brokers retained by the shipper; and

(10)   Use of a warehouse not owned by the shipper.

*Id.* at *2-3.

The ICC subsequently has applied its revised guidelines in administrative proceedings. See, *e.g.*, *Advantage Tank Lines, Inc.*, No. MC-C-30198, 10 I.C.C.2d 64 (March 2, 1994); see also *Atlantic Indep. Union v. Sunoco, Inc.*, 2004 WL 1368808, at *6 (E.D. Pa. June 16, 2004);

*Musarra*, 454 F. Supp. 2d at 710. In an opinion letter dated January 11, 2005, the Department of Labor addressed the relationship between the two tests, acknowledging that the 1992 policy statement followed by the Department of Transportation[6] set forth seven factors for determining a shipper's fixed and persisting intent based upon the incorporation of case law developed subsequent to the cases upon which 29 C.F.R. §782.7(b)(2) rested and had been applied by the DOT and others. See January 11, 2005 Opinion Letter, "*Intra/interstate Transportation of Gasoline and Section 13(b)(1 )*, FLSA2005-10 (citing 1992 Policy Statement).[7]

Defendants urge the Court to apply the more flexible factors set forth in the 1992 Policy Statement and the DOL opinion letter. See Defs. Mem. at 4. As previously noted, Plaintiff's analysis implicitly rests on the more rigid test promulgated by the ICC in 1957 and subsequently adopted as 29 C.F.R. § 782.7. See¸ *e.g.*, Pls. SJ Mem. at 5-6; Pls. Opp. at 11-12. Neither the parties' briefs not the Court's independent review of the case law has uncovered any decision by the Seventh Circuit discussing whether a district court should apply the 1957 test or the 1992 Policy Statement when determining the shipper's intent for purposes of interstate commerce analysis. Several judges in this district have considered whether the MCA exemption applies, but none has directly addressed which standard should be applied. See, *e.g., Jones v. Centurion Invest. Assocs.*, 268 F. Supp. 2d 1004 (N.D. Ill. 2003) (no mention of either test determining the shipper's intent); *McGee v. Corporate Express Delivery Sys.*, 2003 WL 22757757 (N.D. Ill. Nov. 20, 2003) (same)*, Alice v. GCS, Inc.*, 2006 WL 2644958, at *4-5 (N.D. Ill. Sept. 14, 2006)

---

[6]    In 1996, Congress abolished the ICC and transferred many of its functions to the Surface Transportation Board, an agency with the Department of Transportation ("DOT"). See ICC Termination Act of 1995, Pub. L. No. 104-88, § 101, 109 Stat. 803, 804 (1995).

[7] A copy of the January 11, 2005 DOL opinion letter can be found on the Department of Labor website at https://www.dol.gov/esa/whd/opinion/FLSA/2005/2005_01_11_10_FLSA_IntraInterstate.htm (last viewed on December 19, 2008).

(applying the 1957 test codified at 29 C.F.R. § 782.7(b)(2) without mention or consideration of the 1992 policy statement).

In resolving the issue, the Court finds the reasoning of two district courts in other jurisdictions both relevant and persuasive. See *Atlantic Indep. Union v. Sunoco, Inc.*, 2004 WL 1368808, at *7 (E.D. Pa. June 16, 2004) (finding that application of the more recent test delineated by the ICC was warranted). *Musara*, 454 F. Supp. 2d at 711. As the *Atlantic* court aptly explained:

> Many reasons compel the application of the more recent test delineated by the ICC. First and foremost, the determination regarding whether the commerce at issue is interstate or intrastate has always been determined by a totality of circumstances. *Atlantic Coast Line R.R. v. Standard Oil Co.*, 275 U.S. 257, 268 (1927) (holding that in order to determine whether commerce in inter- or intrastate, courts must analysis "the essential character of the commerce" by examining the facts). Moreover, since its inception, many courts, including the *Baird* court that first adopted the 1957 test, have treated the test merely as a starting point from which to look at the totality of circumstances and have looked to factors outside the three-part test in order to determine a shipper's intent. (citations omitted). Additionally, before the ICC revised its older test, three circuit courts noted that the 1957 test was outmoded. *Roberts,* 921 F.2d at 804; *California Trucking*, 900 F.2d at 208; *Central Freight*, 899 F.2d at 413. Finally the ICC is now using the flexible multi-factor test in its own decisions. See, *e.g. Advantage Tank Lines, Inc.*, No. MC-C 30198, 10 I.C.C.2d 64 (March 2, 1994).

*Atlantic*, 2004 WL 1368808, at *7. The *Mussara* court similarly found the 1992 policy statement to be the more appropriate analysis, stating that "in the face of modern advancements and new shipping techniques, [the 1957 test] is no long sufficient to determine a shipper's intent accurately." *Musarra*, 454 F. Supp. 2d at 710-11. The *Musarra* court concluded that the defendant's "shipping system is more similar to those modern systems at issue in the recent cases adopting [the 1992 policy statement] than the 1957 petroleum shipping system at issue in *Baird*." *Id*. The court then distinguished the Sixth Circuit's prior (and controlling) decision in *Baird* as

factually inapposite and concluded that it would "apply [the 1992 policy statement] to determine whether [the defendant] ships goods in interstate commerce." *Id.*

Like the courts in *Atlantic* and *Musarra*, this Court is persuaded that the 1992 policy statement set forth the appropriate criteria for analyzing whether Heritage's local operations constitute interstate commerce. In reaching that conclusion, the Court takes into account the ICC's expertise in evaluating the reach of its own jurisdiction, the ICC's own use of the newer test, and the overarching mandate to consider the "totality of the circumstances" when determining a shipper's intent. The Court also believes that the Seventh Circuit likely would follow the views of the Fifth, Eighth, and Ninth Circuits, all of which have come to the same conclusion within the past two decades. Indeed, the absence of significant argument from Plaintiffs as to the continuing validity of the 1957 test in light of the 1992 policy statement at least tacitly acknowledges the emerging consensus in the agency and the courts that the policy statement reflects the better mode of analysis of a shipper's intent.[8]

## 2. The Shipper's Intent and Heritage's Operations

With the 1992 policy statement in mind, the Court turns to the parties' arguments regarding "shipper's intent." The parties devote considerable attention to whether Heritage (as Defendants contend) or the wineries and vineyards (as Plaintiffs insist) should be considered to

---

[8] The Court declines to give *Chevron* deference to the 1992 policy statement and the subsequent January 11, 2005 DOL opinion letter. See Defs. SJ Mem. at 4 n.2. Neither policy statements nor agency opinion letters warrant *Chevron* judicial deference. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[i]nterpretations such as those in opinions letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law — do not warrant *Chevron*-style deference"). Instead, the policy statement will be given due "respect" as a "reasonable agency interpretation" having some "persuasive force." See *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) ("*Chevron* did nothing to eliminate *Skidmore's* holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency"); see also *Alaska Dept. of Environ. Conservation v. E.P.A.*, 540 U.S. 461, 488 (2004) (citing *Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371. 385 (2003) ("[c]ogent 'administrative interpretations * * * not [the] products of formal rulemaking * * * nevertheless warrant respect.'")); *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 136 (1997) (reasonable agency interpretations carry "at least some added persuasive force.").

be the "shipper" (or "shippers").  Specifically, Plaintiffs argue that "Defendants make the illogical contention that, not only are they the purchaser of the wine that is delivered from out of state, but they also are the shipper of wine for their local Illinois customers" and that "Defendants do not cite to a single authority in support of the proposition that they, not the vineyards/wineries, are the shipper."  Pls. Opp. at 8; see also Pls. SJ Mem. at 7 (arguing the vineyards and wineries are the shippers).  Defendants counter that the facts make clear that Heritage is in fact the shipper.  Defs. SJ Mem. at 4-5; Defs. SJ Reply at 3-4; Defs. Opp. at 4.

The Court agrees with Heritage that, on the undisputed facts before the Court at the summary judgment stage, Heritage – and not the wineries or vineyards – is the shipper for purposes of determining the "shipper's intent" as the wine moves in interstate commerce.  As Plaintiffs point out, it is undisputed that during the relevant period (1) Heritage purchased the wine it delivers to its Illinois customers from vineyards and wineries outside of Illinois and (2) Heritage was designated the purchaser and the customer to whom the wine is delivered on the bills of lading.  Pls. SOF ¶¶ 2,20; Defs. SOF ¶ 35 Gonzalez Dep. at 52;2-5, 52:13-14; Hirsh Dep. at 16:19-22).  However, it also is undisputed that Heritage arranged for the transportation of the wine from those vineyards and wineries to Heritage's Niles, Illinois warehouse by paying for all of the transportation charges, both for the out-of-state services from the wineries and vineyards to its warehouse, and then by employing Plaintiffs to transport the wine to its local customers.  Defs. SOF ¶ 35; Pls. Resp. ¶ 35.

In particular, it is undisputed that Heritage handles all aspects of the transportation (i.e. the shipping), including: (i) paying for taxes associated with transportation; (ii) paying for the freight; (iii) paying for all custom fees for foreign wines; (iv) paying for insurance; (v) transporting the wine freight on board (F.O.B.); (vi) hiring and paying the freight forwarder who

handled the transportation of the wine; (vii) determining the type of shipping container, including the temperature was controlled or refrigerated or insulated; and (viii) acting as its own custom broker. Defs. SOF ¶ 36. During the period from 2004 to 2006, Heritage spent approximately $2 million annually in shipping costs. Defs. SOF ¶ 37. And not only was Heritage responsible for the wine once it left the winery or vineyard, but Heritage also took title to the wine for its domestic purchases upon the wine being tendered to the over-the-road truckers whom it hired to transport the wine to Illinois.[9] Defs. SOF ¶ 38. There simply is nothing in the record to suggest that the wineries and the vineyards, rather than Heritage, were the "shippers" in the transportation of the wine at issue at all, or that the wineries and vineyards handled any part of the transportation and distribution of the wine once it was placed into Heritage's control. For purposes of considering the shipper's intent, the Court finds that there is no dispute that Heritage, and not the original wineries or vineyards, is the shipper, and thus Heritage's intent with respect to the wine controls.

Given the Court's determination that, on the undisputed facts, Heritage is the shipper, the Court next must determine whether any genuine issue of material fact exists as to Heritage's "fixed and persisting intent" under the standard set by the 1992 policy statement. To reiterate, "[t]he essential and controlling element in determining whether the traffic is properly characterized as interstate is whether the shipper has a 'fixed and persisting intent' to have the shipment continue in interstate commerce to its ultimate destination." 1992 Policy Statement, 1992 WL 122949, at *1. "[W]hether the shipper has a 'fixed and persisting intent' that the

_____

[9] Plaintiffs cite Defs. SOF ¶¶ 29 and 38 in support of their contention that Heritage did not take title to the wine until it arrived at the Niles, Illinois warehouse. However, statements 29 and 38, both of which Plaintiffs admitted, actually support the opposite conclusion: Heritage took title to the wine when the wineries and vineyards tendered the wine to over-the-road truckers that Heritage arranged to transport the wine to Illinois.

merchandise continue in interstate or foreign commerce from or to an out-of-State origin or destination, via a warehouse or distribution center, is ascertained from all the facts and circumstances surrounding the transportation." *Id.* at *2. Here, the question is whether the undisputed facts show that Heritage had a fixed and persisting intent that the wine continue on to its Illinois customers without a break in the practical continuity of the product's interstate movement.

Under the pertinent ICC policy statement, the Court must consider seven factors in ascertaining whether the product at issue remained in practical continuity of interstate commerce. The Court notes at the outset that, under the undisputed evidence, several of the factors outlined in the 1992 policy statement are satisfied with respect to the in-state portion of Heritage's delivery practices. To begin with, it is undisputed that Heritage did not process or modify the product — the wine — at its warehouse, thereby satisfying the second factor.[10] Defs. SOF ¶ 52; Pls. Reply at 10, n. 2 (Plaintiffs do not dispute that the "lack of 'substantial modification' to the wine [Heritage] purchases * * * [does not] break [] the chain of interstate movement"). In addition, Plaintiffs do not contest that within Heritage's warehouse, the wine was subject to Heritage's control and direction as to its subsequent transportation or delivery by Heritage's drivers. Defs. SOF ¶ 54. Thus, Defendants have established that Heritage has met the third factor. Furthermore, Plaintiffs admit that Heritage kept detailed record of the transportation of its wine products, including the use of a computer system to track and documenting the wine cases coming and going out of its warehouse. *Id.* ¶ 53. Defendants therefore have established

---

[10] In this respect, Plaintiffs' emphasis on any repackaging of the wine (i.e. transferring of pallets, unwrapping of shrink wrap, etc.) is misplaced. The 1992 policy statement clearly contemplates that product may be repackaged at the warehouse or distribution center without breaking the chain of continuity of interstate commerce. See 1992 Policy Statement, 1992 WL 122949, at *2 ("repackaging or reconfiguring (secondary packaging) may be performed").

without dispute that Heritage has a modern system that tracks product into and out of the warehouse, which is sufficient to satisfy the fourth of the seven factors. Finally, as noted above, it is undisputed that Heritage handles all of the transportation costs, establishing that Heritage bore the ultimate payment of such costs under the fifth factor. *Id.* ¶ 36. All of these undisputed facts weigh in favor of a finding that no break occurred in the practical continuity of the wine's interstate movement and that Heritage's fixed and persisting intent has been that the product continue in interstate commerce beyond Heritage's warehouse.

The parties dispute the first factor – namely, Heritage's fixed and persisting intent as to the ultimate destination of the wine when it started its interstate journey at the winery or vineyard. As previously noted, much of Plaintiffs' argument in the briefing assumed that Heritage was not the shipper, an argument that must be rejected on the facts in the record. Plaintiffs also argue that their local deliveries of Heritage's product were intrastate in nature because Heritage did not know in advance the ultimate destination of specific shipments when it was picked up at the vineyards and wineries. See Pls. SJ Mem. at 7; Pls. Opp. at 11-12. Heritage counters that the record evidence demonstrates that it had a fixed and persisting intent that the wine was to be shipped to someone other than itself (at its warehouse), based on two primary approaches—pre-orders and order projections based on prior customer demand. Defs. Opp. at 5; Defs. SJ Mem. at 5-6.

Under the 1957 test's more rigid requirements, in order to find a "fixed and persisting" intent regarding interstate commerce, the shipper was required to know the ultimate destination of the product *at the time the product began* its interstate journey. The 1992 policy statement, however, explicitly discredited that notion in its list of factors which are "insufficient to break the practicality continuity of interstate commerce" — the first of which is "[t]he shipper's lack of

knowledge of the specific, ultimate destination [] at the time the shipment leaves its out-of-State destination." 1992 Policy Statement, 1992 WL 122949, at *2. Under the policy statement, intent that the product remain in interstate commerce may be found where the shipper moves product based on calculations of customer demand: "Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. The factual basis for projecting customer demand may include, but is not limited to, historical sales in the State, actual present orders and relevant market surveys of need." *Id.* at *2.

Heritage has submitted detailed and uncontroverted evidence of its ordering practices through the affidavit of its President, Defendant Hirsch, based on Hirsch's personal knowledge of Heritage's operations. See Defs. SOF Ex. L, Hirsch Aff. at ¶ 1 (attesting that he "ha[s] been responsible for Heritage's marketing, purchasing, sales, and operational activities" in his capacity as Heritage's President). Notwithstanding Plaintiffs' contrary views, affidavits are an appropriate evidentiary tool for Defendants to use in meeting their burden to prove that they qualify under the MCA exemption for summary judgment purposes. *Hardnick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008) (quoting *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002)) (evidence submitted on summary judgment "'need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content'"). While it is well-settled in this circuit that parties opposing summary judgment may not create an issue of fact by providing conclusory and self-serving affidavits "whose conclusions contradict prior deposition or other sworn testimony in the absence of newly-discovered evidence or the unmistakable need to clarify prior ambiguous

statements," a party clearly may submit "self-serving" affidavits as evidence on summary judgment. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n.5 (2008). In fact, the Seventh Circuit "repeatedly" has stated that "the record may include a so-called 'self-serving' affidavit provided that it is based on personalized knowledge." *Dalton v. Battaglia*, 402 F.3d 729, 735 (7th Cir. 2005); see also *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Provided that the evidence meets the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts" – a self-serving affidavit is acceptable evidence for summary judgment purposes).

In fact, if Plaintiffs had so desired, upon receiving Hirsch's affidavit in Defendants' summary judgment materials, Plaintiffs could have filed a motion for additional discovery as to the topics upon which he provided testimony in his affidavit. "A district court may defer a ruling on a summary judgment motion if a party submits an affidavit explaining why the party has been unable to obtain the evidence necessary to oppose the motion." *Microsoft Corp. v. Rechanik*, 249 Fed. Appx. 476, 479 (7th Cir. 2007) (citing Fed. R. Civ. P. 56(f)); *Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000)). Such a motion and supporting affidavit may even be "sufficient grounds to deny the [summary judgment] motion." *Id.* (citing *First Nat'l Bank & Trust Corp. v. Am. Eurocopter Corp.*, 378 F.3d 682, 693-94 (7th Cir. 2004)). Plaintiffs, however, brought no such motion, nor have they provided any evidence to controvert the attestations made by Hirsch. Thus pursuant to this district's local rules, the Court deems the statements of fact in Hirsch's affidavit admitted when considering the summary judgment motions before it. See *supra* Section II.B at n.4.

Defendants thus have established the following uncontroverted facts: (1) approximately 5% of Heritage's total gross sales (and 25% of its shipments) of product delivered by Plaintiffs

were the result of pre-orders or pre-arrival orders, in various arrangements with its customers prior to local delivery (See Defs. SOF ¶¶ 41-44, 45); and (2) Heritage used customer demand projections to determine the amount of wine it would need to purchase and ship in order to fulfill its customer needs in Illinois (Defs. SOF ¶¶ 47, 49).  It also is undisputed that when Hirsch formulated customer projections for Heritage, he considered historical data of both Heritage's sales and Heritage's customer needs, as expressly contemplated by the 1992 policy statement.  See, *e.g.*, Defs. SOF ¶ 47; see *Atlantic*, 2004 WL 1368808, at *7 (finding shipments to be interstate in nature when there were made in response to customer demand projections based on historic need).  Plaintiffs offer no response to these facts, and thus the Court concludes that Defendants have satisfied the first factor, in addition to the four factors already established.

Finally, the Court must consider two additional arguments in regard to the practical continuity of interstate commerce issue:  (1) the length of time that the wine may sit within Heritage's warehouse (see, *e.g.*, Pls. SJ Mem. at 8-9) and (2) the fact that the bills of lading only designate Heritage and do not provide any further destinations for the  product beyond Heritage's warehouse.  Pls. SOF, Ex. 3, Hirsh Dep. at 16:19-22; Pls. SOF ¶ 20.  Plaintiffs contend that both of these factors undermine Defendants' argument that they intended the product to continue on to a further destination.

As Plaintiffs aptly point out, "[i]ndefinite storage in a warehouse may transform goods shipped from out-of-state into intrastate deliveries."  *Watkins v. Ameripride Servs.*, 375 F.3d 821, 825 (9th Cir. 2004).  But, here, the time period was not "indefinite."  It is undisputed that Heritage's wine could sit in the warehouse for up to a month at a time, even with constant rotation and with certain pre-orders or pre-arrival business leaving the warehouse within a few days.  See Defs. SOF ¶¶ 41-46, 50.  Storage for that period of time is insufficient to break

continuity. As the Supreme Court explained, "[t]he entry of goods into a warehouse interrupts but does not necessarily terminate their journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' * * *. [I]f the halt of movement of the goods is a convenient step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended." *Walling v. Jacksonville Paper Co.*, 317 U.S. 568 (1947). Courts subsequently have found that longer periods of rest at a warehouse than those in evidence here do not break the continuity of the interstate nature of the product. See, *e.g.*, *Roberts v. Leonard W. Levine,* 921 F.2d 804, 814 (8th Cir. 1990) (six-month storage period in the company's warehouse did not disrupt the company's fixed and persisting intent that the product continue in interstate commerce to its customers). Moreover, the 1992 policy explicitly states that the presence of certain factors are insufficient to establish a break in continuity of interstate commerce, and specifically includes among those factors that are insufficient "time limitations on the length of storage" and the existence of separate bills of lading for the inbound and outbound movements instead of through bills of lading. 1992 Policy Statement, 1992 WL 122949, at *2-3. Thus, neither of Plaintiffs' arguments changes the result of the Court's analysis.

### 3. The Weight of the Vehicles Driven by Plaintiffs

Plaintiffs next argue that even if the Court finds that the MCA exemption applies before August 10, 2005, Defendants are unable to sustain their burden of proof on the MCA exemption after August 10, 2005, at least as to those Plaintiffs who drove vans weighing less than 10,001 pounds. See, *e.g.*, Pls. Opp. at 16. There is evidence that some of the Plaintiffs occasionally drove such vans. See, *e.g.*, Pls. SOF ¶ 6 (Plaintiffs Thompson and Bennett drove vans on the

few occasions they made deliveries or picked up product out-of-state).  And on August 10, 2005,

Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy

for Users ("SAFETEA-LU"), which amended certain key definitions relating to the MCA

exemption.  See Pub. L. No. 109-59, 199 Stat. 1144 (2005).  "Motor carrier" was redefined, for

relevant purposes, as a "person who provides commercial motor vehicle transportation for

compensation.  49 U.S.C. § 13102(14).  "Commercial motor vehicle," in turn, was defined, in

relevant part, as "a self-propelled or towed vehicle used on the highways in interstate commerce

to transport passengers or property, if the vehicle – (A) has a gross vehicle weight rating or gross

vehicle weight of at least 10,001 pounds whichever is greater."  49 U.S.C. § 31132(1).  The

amendments plainly were directed at defining the motor carrier—in this instance, the employer,

Heritage – and not the individual employees driving the motor vehicles.

In support of their argument, Plaintiffs cite to 29 C.F.R. § 782.2(4), which explains how

the MCA exemption applies to employees whose duties may shift "from one job to another

periodically or on occasion" in any workweek in which the employee engages or intended to

engage in exempt activities.  29 C.F.R. § 782.2(4).  The regulations explain that "as a general

rule, if the *bona fide* duties of the job performed by the employee are in fact such that he is * * *

called upon in the ordinary course of his work to perform, either regularly, or from time-to-time,

safety-affecting activities of the character described in paragraph (b)(2) of this section, he comes

within the exemption in all workweeks when he is employed at such job."  29 C.F.R. § 782.2(3).

The regulations go on to explain that "where this is the case, the rule applies regardless of the

proportion of the employee's time or of his activities which are actually devoted to such safety-

affecting work in the particular workweek."  *Id.*

Drawing on Section 782.2(4), Plaintiffs suggest that any time that an employee drives a vehicle that weighs less than 10,001 pounds – even sporadically or on a one-time only basis – the employee's activities are not "interstate" in nature. That argument fails for several reasons. To begin with, Plaintiffs cite no authority in support of their theory that just because an employee occasionally operates a vehicle weighing less than 10,001 pounds, the activity at issue — delivering wine — is no longer interstate in nature, and thus the MCA exemption does not apply and the "workweek" rationale should be applied instead. In addition, the facts here are far afield from the situation that the regulations were meant to address. Those regulations apply to employees whose job duties generally fall *outside* the MCA exemption and instead are regulated by the FLSA. The regulations provide that when an employee does engage in safety-affected activities — here driving in interstate commerce in any given workweek — the MCA exemption should be applied during that workweek, regardless of the exact portion of the employee's time spent on the exempt activity. The regulations thus make clear that where "mixed" activities occur (expressly contemplated as interstate versus intrastate activities), application of the MCA exemption is favored. Here, the facts align on the opposite end of the spectrum. Plaintiffs' activities normally are exempt because they engage primarily (and, in some cases, exclusively) in conduct that carries out Heritage's interstate commerce activities through the use of vehicles which weighing more than 10,000 pounds. Given the thrust of the regulation to exempt employees when they *occasionally* perform interstate duties, it would be anomalous to disallow the exemption for employees who *almost exclusively* perform interstate duties.

Plaintiffs' argument also implies that the nature of the *employer's* status as a "motor carrier" varies with the weight of the vehicles that its employees drive. The district court's reasoning in *Tidd v. Adecco USA, Inc.*, 2008 WL 4286512, at *2 (D. Mass. Sept. 18, 2008), is

instructive on this point.  In *Tidd*, the plaintiffs argued that a company "is a 'motor carrier' subject to hours regulation by the Secretary of Transportation *only to the extent* that it operates trucks weighing more than five tons, because those heavier trucks are 'commercial motor vehicles' for purposes of the 'motor carrier' definition * * * and, conversely, that a company is not a 'motor carrier' to the extent it operates trucks weighing five tons or less."  *Tidd*, 2008 WL 4286512 at *3.  As the district court in *Tidd* noted, "in theory," it would be possible to deem a company to be a "motor carrier" to the extent it operated larger trucks and not a "motor carrier" to the extent it operated smaller trucks.  *Id.*  However, the court concluded that "without some specific indication that Congress intended such a bifurcation in responsibilities—that is, an affirmative indication beyond the simple fact of the statute's ambiguity—the theory does not recommend itself."  *Id.*

Notably, the defendant in *Tidd* pointed out exactly the situation that presents itself here: drivers might drive both categories of trucks at different times.  *Id.*  The *Tidd* Court aptly noted the problem with that scenario – namely, that the drivers would be subject to two different regulatory regimes. *Id.*; see also see also *Ruiz v. Affinity Logistics Corp.*, 2006 WL 3712942, at *4 (S.D. Cal. Nov. 9, 2006) (noting that motor carriers cannot be subject to both regulatory regimes, and that even a minor involvement in interstate commerce as a regular part of an employee's duties subjects them to the Secretary of Transportation's jurisdiction).  Rather than construing the statute to mandate such a result, the *Tidd* Court reasoned that "a more sensible approach is the 'either-or' interpretation.  *Id.*  This approach would deem an employer to be a 'motor carrier' if it meets the definition * * * because it uses 10,001 pound-plus trucks in interstate commerce, even if it also conducts other operations that do not meet that definition." *Id.* at *4.

This Court agrees with the "more sensible" approach adopted by the court in *Tidd*. The question always has been whether Heritage is a "motor carrier" to whom the exemption applies. It is undisputed that Heritage's delivery operations (as executed by Plaintiffs as the drivers) are undertaken primarily (and *almost* exclusively) with "commercial motor vehicles" weighing more than 10,000 pounds. See, *e.g.*, Defs. SOF ¶¶ 6, 9, 12, 18, 20, 23, 26. Thus, under 49 U.S.C. § 13102(14), Heritage is a "motor carrier," the hours of its employees are subject to regulation by the Secretary of Transportation (49 U.S.C. 31502(1)), and the MCA exemption applies *in toto*, including on the rare occasions when an employee drives a vehicle less than 10,001 pounds.[11]

### 4. The Illinois Liquor Control Act

Finally, the Court addresses the parties' dispute over the significance and the applicability of the Illinois Liquor Control Act (the "ILCA") when considering whether Heritage's local deliveries made by Plaintiffs were part of a practical continuity of interstate commerce. The parties agree that the Illinois Liquor Control Act (the "ILCA") applies to Heritage's operations as an importer and distributor of wine. However, the parties offer vastly different views of the ILCA's significance when considering whether the motor carrier exemption applies. Defendants contend that although the ILCA prohibits the entry of alcohol, including wine, into the Illinois marketplace without first going through a distributor, courts in states with similar laws have recognized that such as a system creates a two-legged journey for the importation of wine. Defs. Mem. at 6-7; Defs. Reply at 2, 5-6. Plaintiffs contend that Heritage's compliance with the ILCA eviscerates any argument by Defendants that the motor carrier exemption applies because "the wine must come to rest once it arrives at Defendants'

---

[11] The sole case cited by Plaintiffs in support of their position, *Dell'Orfano v. Ikon Office Solutions, Inc.*, 2006 WL 2523113, at *2 (M.D. Ga. Aug. 29, 2006), is inapposite. In that case, it was undisputed that at all times "Plaintiff drove a vehicle that weighed substantially less than 10,000 pounds." On the record here, almost exactly the opposite is true: Plaintiffs almost exclusively drove vehicles weighing more than 10,000 pounds and only sporadically drove the lighter vans.

facilities in Illinois" and that it is "well settled under MCA jurisprudence that where goods come to rest at a warehouse and are inventoried and processed, the chain of interstate commerce is broken for MCA purposes." Pls. Opp. at 8-9.

The Court finds that neither party's argument is dispositive when considering the implications of the ILCA as it relates to the application of the MCA exemption on the facts of this case. The ILCA, in relevant part, requires that:

> Each importing distributor * * * shall effect possession and physical control thereof by storing such alcoholic liquors in the premises wherein such importing distributor * * * is licensed to engage in such business as an importing distributor * * * and to make such alcoholic liquors which accompanying invoices, bills of lading, and receiving tickets available for inspection by an agent or representative of the Department of Revenue and of the State Commission.

> All alcoholic liquor imported must be of-loaded from the common carrier, vehicle, or mode of transportation by which the alcoholic liquor was delivered into this State. The alcoholic liquor shall be stored at the licenses premises of the importing distributor before sale and delivery to licensees in this State.

235 ILCS 5/6-8. Simply put, the ILCA requires that out-of-state shippers use a distributor, with all the attendant requirements, in order for their product to reach Illinois residents. It does not, by its terms, destroy the chain of interstate commerce, as Plaintiffs contend, nor does it validate, by its terms, interstate commerce as Defendants would have the Court believe. As noted above, intrastate transportation may qualify as interstate commerce "if what is being transported is actually moving in interstate commerce within the meaning of [the FLSA and the Motor Carrier Safety Act (MCA)]; the fact that other carriers transport it out of or into the State is not material." 29 C.F.R. § 782.7(b)(1); *Alice v. GCS, Inc.*, 2006 WL 2644958, at *3 (N.D. Ill. Sept. 14, 2006). The mere fact that Heritage has a warehouse where the product must be unloaded prior to being transported locally by Plaintiffs, rather than being transported directly to the ultimate end point by the over-the-road carriers hired by Heritage to transport the product from

distant out-of-state vineyards and wineries, does not alter the Court's analysis of the shipper's intent outlined above.

* * * * *

Considering the totality of circumstances and the unrefuted facts set forth by Defendants, the Court concludes that Defendant clearly has met its burden of showing that Plaintiffs' deliveries of Heritage's wine on the intrastate leg of its delivery within Illinois fall "plainly within the terms" of the MCA exemption. Under the factors set forth in the applicable policy statement, Defendants have established their fixed and persisting intent that the wine that Defendants bring to Illinois from out-of-state and foreign wineries and vineyards continue in interstate commerce to Defendants' own Illinois customers. See, *e.g.*, January 11, 2005 Opinion Letter, "*Intra/interstate Transportation of Gasoline and Section 13(b)(1)*", FLSA2005-10 (citing 1992 Policy Statement and finding interstate activity where four of the seven factors were satisfied). Finally, the Court finds that a Plaintiff's occasional driving of a vehicle weighing less than 10,000 pounds does not alter Heritage's status as a motor carrier, and thus does not defeat application of the MCA exemption to Plaintiffs' activities. In sum, the MCA exception applies to Defendants' activities, Plaintiffs' request for overtime relief under the FLSA must be denied, and Heritage is entitled to summary judgment.

### C.    Defendant Hirsch's Individual Liability for Plaintiffs' Overtime Claims

Because this Court finds that the MCA exemption applies and that summary judgment is proper in favor of Heritage, no claims remain against Defendant Hirsch in his individual capacity, even assuming *arguendo* that as Heritage's President Defendant Hirsch could have been held liable based on upon his decision-making authority with respect to Plaintiff's work

terms and hours.  Plaintiff's motion for summary judgment as to their overtime claims against Defendant Hirsch in his individual capacity is therefore denied.

> **D.** **Failure to Exhaust Grievance Procedures under the Collective Bargaining Agreement**

Defendants also contend that Plaintiffs' claims are barred in their entirety here in federal court for failure to exhaust their administrative remedies, namely the grievance procedures under the collective bargaining agreement related to their overtime claims.  Defs. Mem. at 14. Plaintiffs respond that their FLSA claims are independent of and do not require interpretation of the collective bargaining agreement, and therefore are not preempted.  Pls. Opp. at 3-4.  Because the Court already has found that Plaintiffs' overtime claims are barred by the MCA exemption because they do not fall under the regulatory framework of the FLSA, the Court need not consider whether the collective bargaining agreement bars Plaintiffs' claims from independent review in federal court under the FLSA.  Defendants' motion for summary judgment on that ground therefore is denied as moot.

**IV.** **Conclusion**

For the reasons set forth above, Plaintiffs' motion for summary judgment [31] is denied and Defendants' cross-motion for summary judgment [46] is granted in part and denied as moot in part.

Dated:  December 29, 2008

_____
Robert M. Dow, Jr.
United States District Judge